**Darnell TAYLOR, on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**Wilbur J. SCHMIDT, individually and in his capacity as Secretary of the Department of Health and Social Services; and, Sanger B. Powers, individually and in his capacity as Administrator of the Wisconsin Division of Corrections, and Ramon Gray, individually and in his capacity as Warden of the Wisconsin State Prison at Waupun, Defendants.**

**No. 72-C-243.**

United States District Court, W. D. Wisconsin.

Aug. 8, 1974.

Stuart E. Schmitz, Corrections Legal Services Program, John F. Ebbott, Milwaukee Legal Services, Inc., Milwaukee, Wis., for plaintiff.

Mary V. Bowman, Asst. Atty. Gen., Robert W. Warren, Atty. Gen. of Wis., Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action for declaratory and injunctive relief. Plaintiff has been granted leave to proceed in forma pauperis. 28 U.S.C. § 1915. Jurisdiction is present. 28 U.S.C. § 1343(3); 42 U.S.C. § 1983.

Earlier, I entered an order providing that this action may be maintained by plaintiff as a class action. This action has been tried on its merits to the court. On the basis of the testimony at trial, the exhibits introduced at trial, and the entire record herein, I find as fact the matters set out hereinafter under the heading "Facts."

## *Facts*

Plaintiff has not sought in the state courts of Wisconsin or in any state administrative agency the relief which he seeks in the present action in this court.

### A.  *Old Procedures*

Before November 10, 1972, but after the commencement of this action, intra-institutional disciplinary hearings at the Wisconsin State Prison were conducted as follows, pursuant to procedures promulgated by the Wisconsin Division of Corrections: alleged misconduct was reported by a staff member by filing a conduct report; the inmate was notified of the charges against him by service of a copy of the conduct report on him, ordinarily the night before the disciplinary hearing; the inmate appeared before a three-member committee composed of two permanent members, the Associate Warden for Security and the Associate Warden for Treatment, and one rotating member selected from the security, treatment, administrative, or industrial staff of the Wisconsin State Prison; the Associate Warden for Security was the chairman of the committee; the conduct report was read to the inmate; the inmate was permitted to make a statement in his own behalf so long as the committee considered said statement to be relevant, nonrepetitive and not abusive; the inmate was not permitted to be represented by counsel or counsel-substitute, to call witnesses in his behalf, to confront or cross-examine adverse witnesses, or to be heard by a tribunal composed of individuals other than members of the prison staff; conduct reports which resulted in "guilty" findings, including a brief written summary of the hearing, were placed in inmates' files, the security office files, and social services files; prior to August, 1972, conduct reports which resulted in

a finding of "not guilty" or "charges dismissed" were usually destroyed; after August, 1972, said conduct reports were retained in the same manner as where "guilty" findings were entered; adverse decisions could be appealed by letter to the warden.

### B.  *Present Procedures*

New in-prison disciplinary procedures were promulgated by the Wisconsin Department of Health and Social Services effective on November 10, 1972, for all Wisconsin adult correctional institutions, including the Wisconsin State Prison. These procedures are applicable in "any disciplinary matter which may result in isolation, punitive segregation, loss of ability to earn wages, or forfeiture of good time," and accordingly are applicable to any matter which may lead to an inmate's confinement in administrative or first grade segregation, second grade segregation, third grade segregation, idle gang, temporary lock-up, detention, or solitary.[1] Defendants have not promulgated a written code which correlates specific rule infractions with specific sanctions or with limited ranges of sanctions. The inmate rule book simply describes the rules and describes the full range of possible penalties for infractions, from reprimand to solitary confinement or criminal prosecution in a state court.

### 1.  *Notice*

Under the present procedures, alleged misconduct is reported by a staff member who fills out a conduct report.[2] Upon the filing of the conduct report, a determination is made by either the disciplinary committee or its designate as to whether a guilty finding would subject the inmate to any of the sanctions specified above. If so, the regulations provide that the disciplinary committee

---

1. The conditions, privileges, and restrictions of each of these various kinds of confinement are set ·out, *infra* at 8–12. All of the findings herein are limited to the Wisconsin State Prison.

2. An officer observing what he believes to be a rule infraction may warn the inmate, verbally reprimand the inmate, or write out and file a conduct report.

or its designate "shall immediately" hold an "initial hearing" where the inmate appears in person and is furnished written notice of the charges against him and written and verbal notice that he is entitled to a disciplinary committee hearing before the committee, at a specified time and place. The rules provide that absent extraordinary circumstances at least two days must elapse between the date of the delivery of written notice and the date of the hearing. Nothing in the present record indicates that the named plaintiff or other members of the class failed to receive notice sufficiently in advance of the disciplinary proceeding to prepare adequately for said hearing; or that they were inadequately informed about the charges against them or about the nature, time and place of the disciplinary hearing.

### 2. *Counsel*

Inmates are prohibited from retaining and being represented by counsel and counsel is not provided for indigent prisoners. Inmates are informed at the "initial hearing," both in writing and verbally, that they may be represented by a staff advocate; they are provided with a list of the names of the staff members available. This list is composed of volunteer members of the social services, treatment, security, and administrative staffs. The inmate can choose any staff member on the advocate list to represent him; however, an advocate may refuse to represent an inmate who has selected him from the list. According to the regulations, "each advocate shall be a person who is familiar with the rules and procedures of the institution, articulate and able to fairly argue and represent the inmate's cause, and knowledgeable of the disciplinary process and procedures." Plaintiff has not established, either with respect to the named plaintiff's hearings or as a pattern, that the staff advocates selected are unable to represent their clients adequately be-

cause of conflicts between their roles as advocates and their normal roles in the correctional process, because of tensions created among staff members, or because they appear before a committee composed of individuals to whom they owe either a primary or secondary responsibility for security in the prison. However, plaintiff has established that the staff advocates are neither experienced nor trained in presenting facts by examination and cross-examination of witnesses, or by dissecting or offering complex documentary evidence.

### 3. *Calling Witnesses*

At the time of the "initial hearing" the inmate is informed that he may make a request in writing within 24 hours to call any inmate or staff member who is a material eye-witness to any facts in dispute. The regulations provide that "the committee, in its discretion, after making any ex-parte investigation it deems advisable, and determining that any such witnesses are essential to a fair hearing on the disputed facts, will make such witnesses available at the hearing, except where the committee finds any such witness would be subject to risk of harm by appearing and testifying." Plaintiff has not established that requested material eye-witnesses were not made available at disciplinary hearings.

### 4. *Cross-examination and Confrontation*

At the "initial hearing" the inmate is advised that he or his staff advocate will have the opportunity to cross-examine adverse witnesses. The staff member who wrote the conduct report is present at the disciplinary hearing and is questioned directly by the committee. Questions of all witnesses, complainants, and the accused inmates are directed to the chairman of the discipline committee who then repeats the question or asks the witness if he can respond to the question.[3] Plaintiff has not established

---

3. There is some evidence that staff advocates are permitted to cross-examine adverse witnesses directly and that only the unrepre-

sented inmate must direct his questions to the chairman.

that, at a particular hearing or as a pattern at hearings in general, the discipline committee chairman has refused to put questions on cross-examination as requested or that the manner of said redirected questioning has significantly hampered the inmates' defense.

### 5. *Character of Tribunal*

The disciplinary committee is composed of three members of the staff of the Wisconsin State Prison. Two permanent members, the Associate Warden for Security and the Associate Warden for Treatment (or their designates), qualify for membership on the basis of their positions in the institution. The third member is selected for a term of one month, alternatively from the security department and from some non-security department; the desk captain (from the security department) and the supervisors (from the other departments) select the staff members from their respective departments. The Associate Warden for Security is the chairman of the committee and has immediate authority, direction, and control over the other members of the disciplinary committee. He is responsible directly also for the activities of all security officers in the institution, including the security officers who file the conduct reports ordinarily.

It is the policy and practice for a member of the committee to be disqualified and replaced if he has written the conduct report which is before the committee or if he has any personal knowledge about the alleged misconduct. A member of the committee is not disqualified for having accused an inmate of misconduct in the past, or for having repeatedly participated in disciplinary proceedings arising from an inmate's misconduct. Many of the staff members who file conduct reports or who are called as witnesses are officials who work under the direct and close supervision of the committee members; the committee members themselves may have frequent contacts with the prisoners; these relationships of the committee members to staff members and to inmates will necessarily be significantly affected if the word of a prisoner is accepted despite a staff officer's testimony to the contrary; these institutional pressures are particularly forceful with respect to the participation on the committee of the Associate Warden for Security and other top security officers; and as a result of these factors and others, the committee is predisposed to believe that the conduct report is accurate unless the inmate shows otherwise.

### 6. *Written Record*

A written record is to be maintained at each hearing. Said record includes: notice of the charge and date of hearing; a demand for formal hearing, staff advocate, and witnesses (or a waiver and a consent form if the inmate chooses to waive the hearing); a check list for initial appearance record; and a worksheet for a disciplinary hearing record. The worksheet is to include a summary of the hearing, a statement of the accused inmate, a summary of the statements and testimony of witnesses, an evaluation by the committee of the issues to be decided and the credibility of witnesses' testimony, and the decision of the committee including a narrative decision, the reasons underlying the decision, and the disposition. The inmate receives only the last page of the worksheet, which includes the decision and disposition, and a copy of the conduct report and notice of the charge. The disciplinary committee has rather consistently failed to maintain records of the hearings which contain reasonably detailed evaluations of the issues to be decided, adequate discussions of the evidence relied upon (particularly the credibility of witnesses), and sufficient elaboration of the reasons underlying the decisions.

### 7. *Disclosure of Evidence Against the Inmate*

Plaintiff has failed to establish that the hearing panel considers evidence

which is not disclosed to the accused inmate.

## C. *Types of Segregated Confinement*

In addition to being incarcerated as a member of the general prison population, an inmate may be incarcerated in the following statuses of segregated confinement: administrative (or first grade) segregation, second grade segregation, third grade segregation, detention, solitary, temporary lock-up, idle gang, and observation ("partial" suicide or "full" suicide).

A prisoner in the general prison population is confined in a cell which is slightly narrower than the cells in the Segregation Building; said cell contains a bed,[4] a sink, a toilet, a desk, a chair, a mirror, a light bulb, and a locker. An inmate so confined is entitled to maximum privileges within the Wisconsin State Prison including but not limited to: keeping personal toiletries and other belongings in his cell; canteen privileges (including hobby purchases); interviews and supervised visits;[5] religious worship privileges; writing privileges; recreation privileges; exercise privileges (including sports); the opportunity to work and earn money;[6] the opportunity to attend school or vocational training; the opportunity to attend individual or group therapy; the privilege of keeping reading material in the cell; the opportunity to write articles for, and to receive copies of, the prison newspaper; law library privileges; smoking privileges; talking privileges;[7] and the opportunity to earn industrial[8] and statutory[9] good time.

A cell in administrative (or first grade) segregation is slightly larger than a cell in the general population and has hot and cold running water; an inmate so confined has fewer privileges than an inmate in the general population; he may keep personal toiletries in his cell; he has canteen privileges except for hobby purchases; the opportunity for exercise may vary from no exercise to four days' exercise per week for one to two hours;[10] said exercise consists of walking or light calisthenics in the yard as no facilities are available for more structured or varied exercise; he is afforded no opportunity to attend classes but may study correspondence courses and other educational materials; he has no opportunity to work or earn money and accordingly no opportunity to earn industrial good time; he is afforded the opportunity to earn statutory good time; he has the same smoking, writing, reading and radio privileges as inmates in the general population except that he may not exchange magazines; he may not attend regular chapel services in the absence of exceptional circumstances but chaplains occasionally visit the segregation building; his visiting privileges are limited to one hour per week with mem-

---

4. The bed consists of a metal frame hung from the wall by a chain with a spring bottom.

5. Visiting is permitted every day; on weekdays visits are permitted for up to four hours a day; on weekends and holidays, visits are limited to one hour and visiting time for these days is earned on the basis of 2 hours per calendar month, cumulative up to 12 hours.

6. The normal routine for inmates in the general population who work is to leave their cells at 7:00 A.M., to return for lunch at 11:20 A.M., and then to work from 12:30 until 4:00 P.M.

7. Talking at normal conversational level in the cell halls is permitted between 5:40 a.m. and 7:00 p.m.

8. Industrial good time is the diminution of time to be served which is earned by an inmate whose diligence in labor or full-time study surpasses the general average.

9. Statutory good time is the diminution of time to be served which is earned by an inmate "who conducts himself in a proper manner and performs all the duties required of him."

10. Exercise is not available on weekends or holidays, in inclement weather, when there is insufficient staff available, when there are crews working near the segregation building, when bi-weekly haircuts are given, and on shower days.

bers of his immediate family; if his behavior is satisfactory he may attend group therapy sessions but is eligible otherwise only for a lay therapy program in the segregation building; he has the opportunity to write for, and receive, the prison newspaper; he may have a typewriter and do legal work in his cell, and has a four-hour period in which to exchange legal papers with other inmates after inspection by an officer; his cell is subject to frequent and irregular searches; and he is strip-searched after visits and after he returns to the segregation building following any absence.

Second grade segregation is similar in its conditions and restrictions to first grade segregation except that incoming and outgoing correspondence (including mail from attorneys) is inspected for contraband and read by the administration;[11] visiting privileges are limited to two one-hour visits per month with the immediate family; and books are permitted but not the exchange of reading materials.

Third grade segregation is similar in its conditions and restrictions to confinement in second grade segregation except that only one one-hour visit per month with the immediate family is permitted.

Confinement in idle gang is similar in its conditions and restrictions to first grade segregation except that no legal work is permitted within the first six days and special permission is required to do legal work thereafter; no exercise is permitted; no smoking is permitted; and no talking is permitted.

Detention status is similar in its condition and restrictions to first grade segregation except that the inmate is in a detention cell with double doors, one of solid wood, the other barred; no canteen privileges are permitted; there are no radio privileges; there are no school privileges and the inmate may not have study or correspondence course materials; writing privileges are not granted absent special permission nor can personal mail be received; legal mail can be received but not sent out without special permission; no talking is permitted; no recreation or exercise outside the inmate's cell is permitted; and the inmate earns statutory, but not industrial, good time.

Solitary confinement is similar to detention. However, when solitary confinement is imposed, the sanction also includes forfeiture of statutory good time.[12]

Temporary lock-up is a holding status used for segregating an inmate pending investigation of discipline charges; and the conditions, privileges, and restrictions are the same as those of first grade segregation except that if the inmate has had a job assignment prior to placement in temporary lock-up, he continues to earn industrial good time and wages.

Confinement in administrative or first grade segregation may be of unlimited duration;[13] confinement to second grade segregation is limited to thirty days, subject to extensions for misconduct during the thirty day period, if established before the disciplinary committee; confinement in third grade segregation is limited to ninety days, subject to extensions by the disciplinary committee after hearings; confinement in idle gang status is limited by the administration's determination that the inmate is willing and able to work at his assigned job; confinement in detention is limited to nine days subject to extension

---

11. Inmates may write sealed letters to judges, the governor, and officials of the Department of Health and Social Services.

12. Five days of statutory good time is forfeited for the first offense; ten days for the second offense; twenty days for each subsequent offense. If an inmate is placed in solitary confinement more than four times, he may forfeit all good time.

13. An inmate can be placed in first grade segregation by choice (for example because he fears other inmates in the general population) or as a punishment for misconduct.

by the disciplinary committee; and confinement in solitary confinement is limited to nine days subject to extension by the disciplinary committee and is usually followed by confinement in second or third grade segregation.

Confinement in first, second, or third grade segregation, detention, solitary confinement, or temporary lock-up deprives an inmate of many freedoms which are enjoyed by those confined in the general population and which are highly valued in the prisoners' world (as well as in the world beyond the prison walls).

#### D. *Named Plaintiff Taylor*

Plaintiff Taylor is presently confined in the Wisconsin State Prison; since January, 1971, plaintiff has had at least 20 to 30 disciplinary hearings; during said period plaintiff has spent varying periods of time in first grade segregation, second grade segregation, detention, solitary and temporary lock-up; and during said time he has been unable to earn industrial good time and has forfeited at least 15 days of statutory good time.

#### OPINION

■ Rule 23(c)(1) provides that an order determining whether an action may be maintained as a class action "may be altered or amended before the decision on the merits." Rule 23(c)(1), Fed.R.Civ.P. I now hold that plaintiff Taylor may maintain this action on behalf of a class consisting of those inmates of the Wisconsin State Prison who have been placed in administrative or first grade segregation, second grade segregation, third grade segregation, detention, solitary, idle gang status, or temporary lock-up as a result of alleged misconduct, and on behalf of a class consisting of those inmates in the Wisconsin State Prison who are experiencing a genuine and practical threat that as a result of alleged misconduct, they may be placed in administrative or first grade segregation, second grade segregation, third grade segregation, detention, solitary, idle gang status, or temporary lock-up.[14]

■ Plaintiff is entitled to maintain this action in this court for declaratory and injunctive relief, other than for the restoration of forfeited statutory good time or forfeited industrial good time, without first exhausting any state remedies which may be available to him. Wolff v. McDonnell, —— U.S. ——, 94 S. Ct. 2963, 41 L.Ed.2d 935 (1974); Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).[15]

My decision on the merits of this case is controlled by *Wolff v. McDonnell* and by *United States ex rel. Miller v. Two-*

---

14. My earlier order provided for a class action on behalf of inmates of Wisconsin State Prison who are presently in administrative segregation, segregation first grade, segregation second grade, temporary lock-up, detention, or solitary, and on behalf of inmates experiencing a genuine and practical threat of being placed in said statuses.

Although it does not appear on the present record that named plaintiff Taylor has been confined in the statuses of third grade segregation or idle gang, I now find that he can also adequately and fairly protect the interests of those members of the class who are confined in said statuses, or threatened with such confinement, given the continuum of privileges and restrictions present in all punishment statuses and the similarity of the disciplinary procedures preceding the impositions of said statuses.

There is no evidence in the record that plaintiff Taylor was ever placed in observation "partial" suicide or observation "full" suicide. Because the imposition of said statuses often involves psychiatric judgments, because they are not intended to be punitive but to protect the inmate from himself, and because for other reasons I conclude that said statuses are *sui generis*, I find that plaintiff Taylor is not an adequate representative for inmates so confined or threatened with such confinement.

15. It is permissible for plaintiffs to rely upon the loss of statutory good time or industrial good time to establish that they have sustained or are likely to sustain a "grievous loss," see text *infra* at 15, but to omit from their prayer for relief a request for restoration of good time, thereby avoiding the exhaustion requirement.

mey, 479 F.2d 701 (7th Cir. 1973).[16] Both deal directly with the central issues of this case. The principal uncertainty persisting in their wake is whether, and to what extent, the constitutionally minimal procedural protections in prison disciplinary cases may vary depending upon the nature of the sanction to be imposed.

Miller v. Twomey rather strongly implies that the constitutionally required procedural protections will vary, depending upon the severity of the sanction imposed, and the reasoning of Wolff v. McDonnell seems to confirm this view. However, it appears that, in light of Wolff v. McDonnell, there is no need to pursue this potentially difficult inquiry.

■■■■ In Wolff v. McDonnell, the complaint was limited to the imposition of the sanction of deprivation of good time. —— U.S. at ——, 94 S.Ct. at 2982, n. 19. However, it appears that in fact the procedures employed prior to the deprivation of good time were the same as those employed prior to disciplinary confinement. *Id.*, at ——, 94 S.Ct. at 2969, n. 5; ——, 94 S.Ct. at 2970, n. 8; —— – ——, 94 S.Ct. 2972–2975. It also appears that disciplinary confinement consisted of two types of conditions (id., at ——, 94 S.Ct. at 2973, n. 9):

> "[The inmate] may be incarcerated alone in the usual 'disciplinary cell,' with privileges severely limited, for as long as necessary, or he may be put in a 'dry cell,' which unlike regular cells, contains no sink or toilet."

With respect to the comparison between the deprivation of good time and the imposition of "solitary confinement," the Supreme Court remarked (id., at ——, 94 S.Ct. at 2982, n. 19) that:

> ". . . it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required. . . . [Solitary confinement] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good-time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good-time would also be required for the imposition of lesser penalties such as the loss of privileges."

At the conclusion of this opinion, I will express a critical view of the opinion in Wolff v. McDonnell. I conclude, however, that the only fair reading of it is that no greater procedural protections are constitutionally required prior to the imposition of "solitary confinement" than prior to the forfeiture of good time. Therefore, the procedures challenged in the present action in this court, leading either to the deprivation of good time or to the imposition of segregated confinement (administrative or first grade; second grade; third grade; detention; solitary; idle gang; or temporary lock-up), need meet no constitutional test more severe than that imposed in Wolff v. McDonnell with respect to procedures prior to the forfeiture of good time.

Under Wolff v. McDonnell:

(1) The advance written notice of the claimed violation furnished the plaintiff and his class by the defendants is constitutionally adequate.

---

16. In Miller v. Twomey, the court dealt with a number of appeals from district courts, including one from this district. The court expressed its concern that state correctional officials be afforded an adequate opportunity to grapple with these issues and to attempt to promulgate the procedural regulations they consider appropriate in light of the opinion in Miller v. Twomey. 479 F.2d at 718–719. Defendants have subsequently declared that in this action they choose to stand upon the procedures provided to be in effect during the trial of this action.

(2) The opportunity to call witnesses furnished the plaintiff and his class by the defendants is constitutionally adequate.

(3) The decision-making tribunal is constitutionally sufficiently impartial.

(4) The opportunity for the assistance of a lay representative furnished the plaintiff and his class by the defendants is constitutionally adequate.

(5) The opportunity to confront and cross-examine accusers furnished the plaintiff and his class by the defendants is constitutionally adequate.

(6) The opportunity for disclosure of the evidence furnished the plaintiff and his class by the defendants is constitutionally adequate.

(7) The procedures prescribed in the directive by the Wisconsin Department of Health and Social Services, effective November 10, 1972, are constitutionally adequate with respect to the preparation and maintenance of a written record of the proceedings. The procedures actually observed by the defendants have been constitutionally inadequate in certain respects described earlier in this opinion.

I regret that in Wolff v. McDonnell the court failed to search more deeply into, and to deal more precisely with, what I consider the profound federal constitutional issues implicated in the prison system. The now too familiar preamble, —— U.S. at ——, 94 S.Ct. at 2973, in which a reference to the language in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), is balanced off by references to Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.

Ed.2d 718 (1969), and other decisions in which prisoners' claims have been dealt with more sympathetically, leaves the lower courts still bereft of a conceptual framework for decision in the many and varied challenges to the constitutionality of correctional practices. See Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis. 1972), reversed and remanded 489 F.2d 1335 (7th cir. 1973), remanded on rehearing en banc 494 F.2d 85 (7th cir. 1974). I understand keenly the difficulty of the task of constructing such a conceptual framework. I appreciate the reasons why the courts have thought it wise to go slow until the implications of constitutional rulings in the field of corrections can be more clearly discerned. See Miller v. Twomey, 479 F.2d, at 716, 718–719. But similar difficulty attends the development of constitutional doctrine in other areas. If it is determined ultimately that prisoners do indeed enjoy certain federal constitutional rights which are not being recognized by correctional officials, it will become clear that for an extended period the courts have failed to make the constitution a living document for many human beings. The epitaph for these unvindicated constitutional rights of men and women is certain to include such words as these (Wolff v. McDonnell, *supra,* at ——, ——, 94 S.Ct. at 2980, 2982):

"There is much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule. . . ."

"We think that the Constitution should not be read to impose the procedure at the present time. . . ."

"Perhaps as the problems of penal institutions change and correctional goals are reshaped. . . ."

". . . [W]e are content for now to leave the continuing development . . . to the sound discretion of corrections officials. . . ."

"The better course at this time, in a period where prison practices are diverse and somewhat experimental . . . ."

"As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court."

ORDER

██ Upon the basis of the entire record, it is ordered that with respect to the plaintiff and members of his class, and unless any or all of the following items are knowingly and intelligently waived by an inmate, the defendants are enjoined and prohibited from imposing a forfeiture of good time, and from imposing confinement in first grade segregation for more than three days, and from imposing confinement in second grade segregation, third grade segregation, idle gang, detention, or solitary confinement for one day or more, unless they prepare and maintain and provide to the inmate a written record of the proceedings which shall include: a copy of the written notice of the charge and of the time and place of the hearing; the inmate's demand for formal hearing, staff advocate, and presence of witnesses (or a written waiver and a consent form if the inmate chooses to waive the hearing); a summary of the hearing, a summary of the statement of the accused inmate, a summary of the statements and testimony of witnesses, an evaluation by the hearing committee of the issues to be decided and the credibility of witnesses' testimony, a statement of the decision and of the reasons for it, and the disposition; provided, however, that when the hearing committee determines that a portion of the evidence should not be included in such a written record because personal or institutional safety is implicated, the written record shall indicate the fact of the omission.