STATE EX REL. ELLENBURG, Petitioner, v. GAGNON, Respondent.†

*No. 75-109.  Argued March 2, 1977.—Decided March 29, 1977.*
(Also reported in 251 N. W. 2d 773.)

† Motion for rehearing denied, without costs, on June 1, 1977.

For the appellant the cause was argued by *Elizabeth Alexander,* Corrections Legal Services Program, with whom on the briefs was *Charles Bennett Vetzner,* Post-Conviction Defense Project.

For the respondent the cause was argued by *James H. Petersen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

PER CURIAM. In June of 1973, the petitioner-appellant Paul R. Ellenburg, an inmate at the Fox Lake Correctional Institution, made a complaint to the assistant wardens concerning alleged wrongdoing by employees of the institution.

The complaint alleged several acts of misconduct, some of which are as follows: Employees of the institution misused money obtained through a federal grant, were using institution facilities for personal gain, were not performing their duties, engaged in homosexual acts with inmates, and specifically named two employees whom he alleged were involved in an illicit sexual relationship outside the institution.

Because of the serious nature of the charges, the warden, John R. Gagnon, the respondent here, ordered a staff investigation. The investigation concluded there was no basis, in fact, for any of the allegations of Mr. Ellenburg.

On July 30, 1973, Gagnon charged Ellenburg with violating an institution rule entitled "False Communication." The rule stated: "No man shall in any way communicate false information to anyone knowing the same to be untrue."

On August 6 and 9, 1973, a three-man disciplinary committee of the institution convened to hear the charge against Ellenburg. After a hearing, in which Ellenburg and a staff counselor on his behalf appeared, the committee concluded the allegation that two institution employees were engaged in illicit sexual conduct was false and that it was a violation of the false communication rule. It recommended that Ellenburg be given seven days of isolation confinement and that three days prison good time be forfeited.[1] The decision of the disciplinary committee was affirmed by the Department of Health & Social Services.

A writ of certiorari was issued by the circuit court for Dodge county on March 1, 1974. On June 13, 1974, the circuit court filed a memorandum decision which directed a judgment be entered affirming the decision of the committee and the department. Judgment was entered January 28, 1975, and this appeal followed.

The appellant has raised several issues and filed an extensive well prepared brief. The appellant contends the false communication rule violates the First Amendment to the United States Constitution in that it is overbroad and vague, that there were several procedural errors and failures in the proceedings before the disci-

[1] The record is not clear as to whether the committee ordered loss of three days good time or whether he ever lost it.

plinary committee, and that the totality of the proceedings denied the appellant of due process as required by the United States and Wisconsin Constitutions.

We conclude that all issues are now moot and that the appeal should be dismissed.

At the time of oral argument the appellant, Paul R. Ellenburg, was no longer an inmate of any Wisconsin correctional institution and not subject to institutional disciplinary rules. He had been released on parole. Because he is on parole, a decision of this court could in no manner affect the provision for institutionalized isolation. At this stage nothing this court could do would affect the isolation one way or the other. As to the loss of three days good time, whether it was taken or not, is *de minimis*. Ellenburg was serving an eleven-year sentence—three days is *de minimis*.

In *Fort Howard Paper Co. v. Fort Howard Corp.*, 273 Wis. 356, 360, 77 N.W.2d 733, the court reasserted its definition of mootness as follows:

"This court in its decision in *Wisconsin E. R. Board v. Allis-Chalmers W. Union* (1948), 252 Wis. 436, 440, 32 N.W.(2d) 190, stated:

" 'A moot case has been defined as one which seeks to determine an abstract question which does not rest upon existing facts or rights, or which seeks a judgment in a pretended controversy when in reality there is none, or one which seeks a decision in advance about a right before it has actually been asserted or contested, or a judgment upon some matter which when rendered for any cause cannot have any practical legal effect upon the existing controversy.' "

In considering the question of mootness, when constitutional or *public juris* questions are involved, this court has on occasion reached the issues presented. However, consideration of constitutional issues as they apply to other persons or other situations is guarded and limited.

In *Cohen v. Towne Realty, Inc.*, 54 Wis.2d 1, 4–5, 194 N.W.2d 298 (1972), we quoted the United States Supreme Court as follows:

" '. . . This Court, as is the case with all federal courts, "has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39. Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.' "[2]

We are not persuaded to reach the constitutional question as to whether the false communication disciplinary rule violates the First Amendment as being overbroad and vague because a subsequent department directive limited the application of the rule. The directive provides as follows:

```
"TO:      Wardens & Superintendents
          Adult Institutions
"FROM:    Andrew A. Basinas, Director
          Bureau of Institutions
"RE:      Rule 5.04—False Communication
```

[2] *See also, State ex rel. Renner v. H&SS Dept.*, 71 Wis.2d 112, 237 N.W.2d 699 (1976) (mootness); *Putnam v. McCauley*, 70 Wis.2d 256, 234 N.W.2d 75 (1975) (procedure for revoking good time).

"Effective immediately, Rule 5.04 (False Communication) is to be used to regulate only those activities that bear a direct effect on the integrity, safety, and security of the institution. The rule is designed to regulate those activities noted in the Manual of Adult Resident Status and Penalties, i.e., lying about and/or presenting counterfeit, forged, or altered records, pass slips, canteen slips, coupons, or any other documents, or communications to the institution, Division or Departmental administration which are intended to incite administrative action. It is not to be used to regulate private communication through correspondence, whether privileged or nonprivileged."

This directive, if followed in future cases, will present essentially different considerations to a challenge that the First Amendment has been violated.

We conclude the issues presented in this case are moot and the appeal should be dismissed.

Appeal dismissed.

ABRAHAMSON, J. *(dissenting)*. Paul Ellenburg was an inmate of the Wisconsin Correctional Institution at Fox Lake. On June 23, 1973, Ellenburg conferred with Associate Wardens Boorman and Ellsworth concerning his complaints about the institution, and the Associate Wardens requested that Ellenburg make his allegations in writing. On June 26, 1973, Ellenburg presented Boorman and Ellsworth with a nine-page verified document specifying acts of misconduct by specific staff members of the Institution. Ellenburg's written report was submitted to the Warden and to the following persons: "Attorney General, U. S. Department of Justice, Governor Patrick Lucey, Attorney General, Dodge County Court House, [Associate Warden] Mr. Boorman, [Associate Warden] Mr. Ellsworth, Paul Ellenberg [sic]." Ellenburg did not, in any way or at any time, discuss these charges with his fellow inmates.

Darrell Kolb, Director of Security for the Division of Corrections, and George Hartman, legal counsel at the Wisconsin State Prison, investigated the charges made by Ellenburg and concluded that Ellenburg's verified complaint was false. On July 30, 1973, the Warden issued a conduct report charging Ellenburg with making unfounded and false statements regarding staff members.[1] The Rules of the Inmate Complaint Review System provide that no resident will be disciplined for filing a complaint or otherwise pursuing a remedy in the complaint review system. The Warden and trial court held that this rule protecting a complainant did not apply to Ellenburg because he did not put his complaint on the proper form or file his complaint with the designated Institution Complaint Investigator (who reports to the Warden) according to the complaint review system.

On August 6, 1973, a disciplinary hearing was convened to hear the Warden's charges against Ellenburg. The warden—the complaining party here—appointed the Disciplinary Committee. The Disciplinary Committee chosen to hear the case consisted of Captain Van Haren, social worker Stanley Ries, and staff psychologist Dr. Edward Goldenberg.[2] Ellenburg was present at the hearing, and he was represented by a staff lay advocate. The Committee rejected Ellenburg's request that he be represented by retained counsel. The Committee rejected Ellenburg's request that he be permitted to examine pris-

---

[1] This conduct was alleged to have violated the following institutional rule:

"False Communication. No man shall in any way communicate false information to anyone, knowing the same to be untrue."

For a description of the in-prison disciplinary procedures effective on November 10, 1972, for all Wisconsin adult correctional institutions, see *Taylor v. Schmidt*, 380 F. Supp. 1222, 1224-1229 (W.D. Wis. 1974).

[2] Wisconsin Correctional Institution Disciplinary Committee (WCIDC).

on records pertaining to the charges in his June 26 document. Ellenburg did not have access to the investigatory report prepared by Kolb and Hartman referred to above. Nor did Ellenburg have information concerning other sources upon whom the Committee relied.

One of the members of the Disciplinary Committee, Dr. Goldenberg, argued that the matter should not be considered by the institution. On August 8, 1973, when the Disciplinary Committee reconvened, Dr. Goldenberg, the only member who had uttered any comments favorable to Ellenburg, was no longer on the panel. No reason for this change of the hearing panel appears on the record. Guard Danny Goetsch assumed Dr. Goldenberg's seat on the Disciplinary Committee.

The Committee repeatedly urged Ellenburg to reveal the name of the staff member who had provided the information for his allegations. Ellenburg refused, indicating that he would first need an opportunity to discuss the situation with his attorney. He asked if he could call his retained attorney. His request was denied. Ellenburg claims he was potentially subject to criminal prosecution if his sworn affidavit contained intentional falsehoods. Secs. 946.32(2), 942.01, Stats. Yet Ellenburg states he was denied any opportunity to talk with his counsel, and he was not advised of his right to remain silent.[3] Instead committee member Stanley Ries read the institution's contempt rule which authorized the Committee to place an inmate in isolation confinement summarily for obstruction of a disciplinary hearing. Ries took the position that Ellenburg's failure to provide the name of his informant was an obstruction of the proceeding. The Disciplinary Committee informed Ellenburg that the burden of proof would be upon him and, that unless he could demonstrate the truthfulness of his June

---

[3] *Cf. Baxter v. Palmigiano*, 425 U.S. 308 (1976).

written document, he would be found guilty. Ellenburg agreed to reveal his source of information provided that the individual would be sworn in before providing testimony. Committee member Ries assured Ellenburg that the individual would be sworn; Ellenburg then identified his source of information as staff member Richard Kircher.

On August 9, 1973, the Disciplinary Committee reconvened and called Kircher. Despite Ries' previous assurance, the Committee refused Ellenburg's request that Kircher be placed under oath, one of the members of the Committee stating that "Administration says we can not have sworn witnesses . . . advised by legal counsel that we could do it . . . and now the Warden is overruling it." Upon questioning by the Board as to certain of the statements which were charged in the conduct report, Kircher denied having made the allegations to Ellenburg.

Ellenburg alleges he was denied his right to an impartial tribunal. He alleges there was command influence since all the members of the Committee are subordinate to the Warden who is the charging party. He also objects to the Committee having consulted the Warden before the last hearing date on whether the staff member witness should be sworn.

After consideration of the evidence, the Disciplinary Committee determined that Ellenburg's statements were not true and had no basis in fact. The Committee further found that no reasonable prudent person would believe the statements made to have been true. The Committee did not determine whether Ellenburg knew the statements to be false, although the rule he allegedly violated so required. Further, the Commitee found such statements as appeared in the complaint were motivated by elements of anger and vindictiveness. A penalty was imposed—seven days in isolation status. Ellenburg al-

leges that the evidence adduced at the hearing does not support the Committee's decision.

This court has decided that it will not reach the constitutional question of free speech because of a February 16, 1976, directive (quoted by the majority) limiting the application of Rule 5.04 on False Communications to communications threatening the security of the institution. The court was advised of this unpublished directive by the Assistant Attorney General. On further communication with the Assistant Attorney General instigated by this court, it was discovered that the November, 1974 Manual of Resident Status Rules and Penalties (which is now in effect and to which the February 16, 1976 directive is applicable) has a different Rule 5.04 than the one under which Ellenburg was charged in 1973. The rule now reads:

"5.04 *False Communication.* No resident shall in any way (oral, written or otherwise) communicate false information to anyone. (Activities including, but not limited to, lying and presenting counterfeit, forged or altered records, pass slips, canteen slips, coupons, or any other documents, shall be considered violations of this rule.)"

The Assistant Attorney General advised the court that the 1974 "rule now enforced is worded materially different [than the 1973 rule]. There is no 'knowingly false' element in the new rule. My experience tells me that a 'knowingly false' element in fact is required to be established in present disciplinary matters. The current revision of Rule 5.04 will be flagged so as to include this element."

My conclusion from all of this correspondence relating to the false communication rule is that I do not know what rule is presently being enforced in the institution and I do not know which version of the false communication rule has been communicated to inmates of the insti-

tution or to the staff of the institution administering the disciplinary rules. I also find these events subsequent to Ellenburg's offense irrelevant since the Assistant Attorney General at oral argument stated in response to questioning by the court that Ellenburg's disciplinary charge and hearing would have been held under the February, 1976, directive and that the Committee's determination would be the same. In this regard it should be noted that there is no evidence in the record nor is there a finding that Ellenburg's communication threatened the security, good order, or reasonable governance of the institution or discipline of the inmates or interfered with Ellenburg's rehabilitation. Therefore this court's statement that the 1976 directive involves different constitutional considerations than those presented in this case is contrary to the understanding and representations of the Attorney General and counsel for Ellenburg.

Also, Ellenburg's complaint, addressed to prison and public officials whose function includes concern with staff conduct and prison conditions, may fall within his "redress of grievances" right (sec. 4, art. I, Wis. Const.). Reliance on the free speech issue may be unnecessary and unwise. *See* Mr. Justice Robert Hansen's dissent, *State ex rel. Thomas v. State,* 55 Wis.2d 343, 358, 198 N.W.2d 675 (1972).

As a general rule an appeal will be dismissed if the issue becomes moot as to the particular parties involved. However, this court has said "The great weight of authority suggests the proposition that an appellate court may retain an appeal for determination if it involves questions of public interest even though it has become moot. . . ." *Mueller v. Jensen,* 63 Wis.2d 362, 367, 217 N.W.2d 277 (1974). In *State v. Seymour,* 24 Wis.2d 258, 261, 128 N.W.2d 680 (1964), this court retained jurisdiction over a moot question because the enforcement of

the gambling law involved affected many people "and if the appeal were to be dismissed and order below left standing the decision and order below would be left standing to be cited in future cases at the trial level." I believe this case falls within the *Seymour* rationale.

The problems involved in effective discipline procedures at prisons are manifold. At the threshold is the problem of providing the inmate with an understandable set of rules. If a rule is broken then a fair, accurate fact finding procedure must be provided. The function of discipline is to keep the institution under the control of the prison officials and to keep the inmates from harming each other and the guards. Prison discipline may have to be swift and powerful. Guards should not be devoting substantial time to preparing reports and testifying. At the same time, one function of the institution is to rehabilitate the inmate and to inculcate in the inmate a respect for law and the rights of individuals in society. The United States Supreme Court has recognized that although rights of a prisoner are "diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell,* 418 U.S. 539, 555 (1974). *See also State ex rel. Thomas v. State,* 55 Wis.2d 343, 356–357, 198 N.W.2d 675 (1972). Prisoners should not be subject to inaccurate fact finding and arbitrary punishments.

The accommodation between the rights and interests of the inmate and the needs of the institution, though difficult, must be made. The unenviable task of ensuring a workable approach for disciplinary proceedings falls ultimately on the courts.[4] This case raises troublesome

---

[4] For a brief discussion of issues and cases relating to prison proceedings *see* Hoffman, *Prisoners' Rights—Treatment of Prisoners & Post-Conviction Remedies,* c. 3, pp. 3–1 to 3–37 (1976).

issues of the state and federal constitutional rights of prison inmates, and this court should grapple with them.[5]

[5] The following comments of Judge James E. Doyle in *Taylor v. Schmidt,* 380 F. Supp. 1222, 1231–1232 (W.D. Wis. 1974) are applicable here:

"I regret that in Wolff v. McDonnell the court failed to search more deeply into, and to deal more precisely with, what I consider the profound federal constitutional issues implicated in the prison system. The now too familiar preamble, — U.S. at —, 94 S. Ct. at 2973, in which a reference to the language in Price v. Johnston, 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948), is balanced off by references to Cruz v. Beto, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed.2d 263 (1972), Johnson v. Avery, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed.2d 718 (1969), and other decisions in which prisoners' claims have been dealt with more sympathetically, leaves the lower courts still bereft of a conceptual framework for decision in the many and varied challenges to the constitutionality of correctional practices. See Morales v. Schmidt, 340 F. Supp. 544 (W.D. Wis. 1972), reversed and remanded 489 F.2d 1335 (7th cir. 1973), remanded on rehearing en banc 494 F.2d 85 (7th cir. 1974). I understand keenly the difficulty of the task of constructing such a conceptual framework. I appreciate the reasons why the courts have thought it wise to go slow until the implications of constitutional rulings in the field of corrections can be more clearly discerned. See Miller v. Twomey, 479 F.2d, at 716, 718–719. But similar difficulty attends the development of constitutional doctrine in other areas. If it is determined ultimately that prisoners do indeed enjoy certain federal constitutional rights which are not being recognized by correctional officials, it will become clear that for an extended period the courts have failed to make the constitution a living document for many human beings. The epitaph for these unvindicated constitutional rights of men and women is certain to include such words as these (Wolff v. McDonnell, *supra,* at —, —, 94 S. Ct. at 2980, 2982):

" 'There is much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule. . . .'

" 'We think that the Constitution should not be read to impose the procedure at the present time. . . .'

" 'Perhaps as the problems of penal institutions change and correctional goals are reshaped. . . .'

" '. . . [W]e are content for now to leave the continuing development . . . to the sound discretion of corrections officials. . . .'

" 'The better course at this time, in a period where prison practices are diverse and somewhat experimental . . . .'

" 'As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court.' "