In the INTEREST OF JERRELL C.J., a Person Under the Age of 17:

STATE of Wisconsin, Petitioner-Respondent,

v.

JERRELL C.J., Respondent-Appellant.†

Court of Appeals

*No. 02–3423. Oral argument September 17, 2003.— Decided December 23, 2003.*

2004 WI App 9

(Also reported in 674 N.W.2d 607.)

† Petition to review granted 3-23-04.

443

On behalf of the respondent-appellant, the cause was submitted on the briefs of and oral argument by *Eileen A. Hirsch*, assistant state public defender of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *E. Michael McCann*, district attorney, by *John Stoiber*, assistant district attorney, Milwaukee. There was oral argument by *John Stoiber*.

A nonparty brief was filed by *Steven A. Drizin* of the Children and Family Justice Center, Northwestern University School of Law, Chicago, Illinois, and *Keith A. Findley* of the Wisconsin Innocence Project, Frank J. Remington Center, University of Wisconsin Law School, Madison, for the Children and Family Justice Center at Northwestern University School of Law's Bluhm Legal Clinic and the Wisconsin Innocence Project at University of Wisconsin Law School's Frank J. Remington Center.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1 WEDEMEYER, P.J. Jerrell C.J. appeals from an order adjudging him delinquent for the commission of armed robbery, party to a crime, contrary to Wis. Stat. §§ 943.32(1)(b) & (2) and 939.05 (2001–02).[1] He also appeals from an order denying his postdisposition motion. Jerrell claims the trial court erred in denying his motion seeking to suppress his statement. He contends that his statement was involuntary and that the police officers should have granted his request to call his parents. Because the trial court did not err in denying the motion to suppress, we affirm. We do, however, caution that a juvenile's request for parental contact should not be ignored.

## I. BACKGROUND

¶ 2. On Sunday, May 27, 2001, at approximately 12:18 a.m., three young men entered the front door of a McDonald's restaurant in Milwaukee. Each was wearing a ski mask and holding a gun. Two of the men went into the kitchen area and told the employees to get

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

down. The third went to the office, pointed a gun at the manager and said, "give me all the money." The manager complied and gave the robber $3590. The robbers left.

¶ 3. Two employees offered descriptions of the robbers. One employee stated: one was seventeen to nineteen years old, 5'10" to 5'11" tall, medium complexion and build, wearing a black hat and black knit face mask; the second was also seventeen to nineteen years old, had a lighter complexion, a thin build and was 5'8" to 5'9" tall, and wearing a knit face mask. Both were holding guns.

¶ 4. Another employee described the man with the lighter complexion: eighteen to twenty-three years old, light brown "bright" eyes, thin build, wearing a ski mask, holding a small black gun and "the inside of the barrel was red." That evening, Roscoe H., Jerrad H. and Randall J. were detained and later arrested as suspects in the robbery. On Monday morning, May 28, 2001, at approximately 6:20 a.m., fourteen-year-old Jerrell was arrested at his home. He was taken to the police station, booked, and placed in an interrogation room. He was handcuffed to the wall of the room for approximately two hours, until 9:00 a.m. At that time, Police Detectives Ralph Spano and Kurt Sutter began the interrogation.

¶ 5. The two detectives entered the room, introduced themselves to Jerrell, removed his handcuffs, and asked him some background questions. Jerrell told the officers that he was fourteen years old and in eighth grade. He provided the names, addresses and phone numbers of his parents and siblings.

446

¶ 6. At 9:10 a.m., Spano advised Jerrell of his *Miranda*[2] rights. Jerrell waived his rights and agreed to answer questions. Spano told Jerrell that his cousin, Jerrad, had "laid him out for this robbery." Jerrell denied committing any robbery. Spano encouraged Jerrell to be truthful and honest. Jerrell denied participating in the robbery. This exchange continued for the better part of the morning. At times, Spano raised his voice "short of yelling." Jerrell stated that "kind of frightened" him.

¶ 7. Jerrell was kept in the interrogation room until lunchtime, although several food and bathroom breaks were provided. At lunchtime, Jerrell was placed in a bullpen cell for about twenty minutes where he ate lunch. Interrogation resumed at approximately 12:30 p.m., and Spano said Jerrell "started opening up about his involvement" between 1:00 p.m. and 1:30 p.m. Also, at this time, Jerrell made two or three requests to telephone his mother or father. Spano denied the requests, indicating that he "never" allows a suspect to talk to anyone during interrogation because it could stop the flow of, or jeopardize, the interrogation. The interrogation was completed at 2:40 p.m. when Jerrell signed a statement admitting his involvement in the McDonald's robbery.

¶ 8. Jerrell moved to suppress his statement, claiming it was involuntary, unreliable, and a product of coercion. The trial court denied the motion. Jerrell and Jerrad were tried jointly in a court trial. The trial court adjudged both of them delinquent for committing armed robbery, party to a crime.

¶ 9. Jerrell filed a postdisposition motion seeking a new trial on the basis that his admission was unreli-

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

able, untrustworthy and involuntary. The motion pointed out the inconsistencies between Jerrell's statement and that of the eyewitnesses and other participants. The suggestion was that Jerrell, in fact, did not participate in the robbery, but was coerced into admitting participation during the police interrogation. The trial court found the discrepancies between Jerrell's statement and the other evidence were not material. The court concluded that Jerrell's knowledge of the total amount of money stolen, and his description of the gun, were sufficient evidence of reliability. The trial court also found that Jerrell's statement, under the totality of the circumstances, was voluntary. Jerrell now appeals.

## II. DISCUSSION

*A. Statement.*

¶ 10. The issue in this case is whether Jerrell's statement was voluntary. Jerrell contends that the statement was coerced. He argues that given his age, the length of the interrogation, the lack of corroboration and the inconsistencies in the statement, the statement was unreliable and involuntary. The State responds that the interrogation did not involve any coercive techniques, it took place during the day, Jerrell had two prior police contacts, he was provided food and other breaks, and that any inconsistencies between Jerrell's statement and established facts can be explained. The trial court agreed with the State.

¶ 11. The question we must resolve involves both a constitutional issue, whether Jerrell's statement was voluntary, and a discretionary issue, whether the trial

court erroneously exercised its discretion in denying Jerrell's motion to suppress the confession. In reviewing the latter, we will not disturb the trial court's findings of historical or evidentiary facts unless they are clearly erroneous. *See State v. Mitchell*, 167 Wis. 2d 672, 682, 482 N.W.2d 364 (1992). However, the former involves a constitutional issue, subject to independent appellate review. *State v. Esser*, 166 Wis. 2d 897, 904, 480 N.W.2d 541 (Ct. App. 1992).

¶ 12. Our supreme court recently addressed the issue of whether a statement is voluntary in *State v. Hoppe*, 2003 WI 43, ¶¶ 34–40, 261 Wis. 2d 294, 661 N.W.2d 407.

> A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.

*Id.*, ¶ 36 (citation omitted). We first must address whether Jerrell's confession was "coerced or the product of improper pressures exercised" by the police officers conducting the interrogation. *Id.*, ¶ 37. We cannot conclude that the confession was involuntary without first concluding that coercive or improper police conduct occurred. *Id.*

¶ 13. In determining whether Jerrell's confession was voluntary, we consider the totality of the circumstances. *Id.*, ¶ 38. This test requires "balancing . . . the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforce-

ment officers." *Id.* Relevant factors to consider include the individual's age, maturity, intelligence, education, experience, ability to understand, and presence of parents, guardian or counsel, *Theriault v. State*, 66 Wis. 2d 33, 42–43, 223 N.W.2d 850 (1974), as well as the defendant's physical and emotional condition, *Hoppe*, 261 Wis. 2d 294, ¶ 39. We balance the personal characteristics against the police pressures and tactics employed to induce the confession, such as

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.* Finally, when a juvenile is involved, courts must use the "greatest care" in assessing the voluntariness of the confession. *In re Gault*, 387 U.S. 1, 55 (1967).

¶ 14. We begin then with whether any coercive or improper police conduct occurred. We review whether, under the totality of the circumstances, Jerrell's statement was "coerced or suggested," or "the product of ignorance or rights or of adolescent fantasy, fright or despair." *Gault*, 387 U.S. at 55. This test involves balancing personal characteristics of the individual against the conduct of the police during the interrogation.

¶ 15. The first factor to be considered is age. Jerrell was fourteen years and ten months old at the time of the interrogation. Citing *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002), *cert. denied*, 123 S.Ct. 1802 (2003), Jerrell argues that this factor favors finding that the statement was not voluntarily given: "The

difficulty a vulnerable child of 14 would have in making a critical decision about waiving his *Miranda* rights and voluntarily confessing cannot be understated." *See id.* at 764. He points out that the younger the child, the more carefully the court must scrutinize police interrogation tactics. *See id.* at 765. The State emphasizes that Jerrell was *almost* fifteen years old and had two prior contacts with the police in which he was advised of his *Miranda* rights and waived them. The State also focuses on the fact that no evidence demonstrated that Jerrell was emotionally distraught or upset by the interrogation of the officers. Rather, Jerrell seemed to be "smirking" during most of the interrogation. The trial court found that Jerrell's age did not result in a statement that was a product of "adolescent fantasy." We cannot locate anything in the record to render that finding erroneous.

¶ 16. Although Jerrell was under fifteen years old at the time he made his statement, there was no indication in the record that his age interfered with his ability to provide a voluntary statement. As noted by the trial court, Jerrell was emotionally stable during the entire interrogation and showed no signs of psychological breakdown as a result of the questioning.

¶ 17. The second factor considered is education and intelligence. The trial court noted that Jerrell was in eighth grade. Given the time of year this incident occurred, it is safe to assume that Jerrell was nearing the completion of this grade. There is some dispute, however, regarding level of intelligence. The trial court noted that Jerrell had a 3.6 grade point average and appeared to be of higher than average intelligence. Jerrell points out that the high grade point average was not typical of past grades and that his IQ tests placed him in the lower end of average intelligence. The trial

court found that these factors did not interfere with Jerrell's ability to give a voluntary statement. There is evidence in the record to support that finding and, therefore, we will not disturb it.

¶ 18. Additional factors to consider are Jerrell's maturity and experience. The trial court found that Jerrell appeared to be a mature, articulate individual. There was no evidence of any mental disease or defect, no indication that he was impaired by drugs, medication or alcohol, and no information suggesting he was in any physical pain or injured, and it appeared that Jerrell was "not apprehensive, fearful, [or] fretful while he was questioned." The trial court noted that immediately following the interview, Jerrell appeared "bored." The trial court also found that Jerrell had two previous contacts with police, thus suggesting that his susceptibility to coercive police tactics would be reduced. *See Hardaway*, 302 F.3d at 767 (it may be presumed that children who have a history of criminal involvement are more likely to understand their *Miranda* rights, and less likely to be susceptible to coercive conduct). Jerrell argues that his two prior contacts were insignificant as both involved misdemeanors and not serious offenses. Although we can appreciate the distinction, the fact remains that on both of those two prior occasions, Jerrell was given his *Miranda* rights and waived them. Accordingly, the previous police contacts weigh in favor of finding that Jerrell's statement was voluntary.

¶ 19. During the questioning, Jerrell made several requests to call a parent. The trial court did not find this factor significant in this case for several reasons. First, the requests came after Jerrell had admitted involvement, and second, the denial of the request was not for the purpose of denying Jerrell his right to counsel or right to remain silent. Therefore, the

trial court found that the denial did not constitute improper police conduct. Accordingly, this factor did not implicate the voluntariness of Jerrell's confession. Although we address this issue more in depth in the latter part of this opinion, for dispositional purposes, we cannot conclude that the trial court's finding was clearly erroneous. The police officers' denial of Jerrell's request to call his parents was not *per se* coercive. *Theriault*, 66 Wis. 2d at 38.

¶ 20. In reviewing the totality of the circumstances, we also examine the length and circumstances of the interrogation. Jerrell's interview took place during the daylight hours and lasted a little more than five and one-half hours. Thus, the questioning did not take place during a time period that would suggest Jerrell might have been tired and, as a result, unfairly susceptible to police questioning. *See Johnson v. State*, 75 Wis. 2d 344, 355, 249 N.W.2d 593 (1977) (statement given during the time an individual would otherwise be asleep is a factor to consider when evaluating an individual's susceptibility to police pressure). During the questioning, Jerrell was afforded food and bathroom breaks, including a twenty-minute lunch break. It was estimated that throughout the interview, there were between five and seven breaks.

¶ 21. Jerrell points out that he was handcuffed in a bullpen cell from the time he arrived at the station after being picked up at 6:20 a.m., until the interview began at 9:00 a.m. He points out that throughout the entire morning he repeatedly denied any involvement. He stated that he was somewhat fearful when Detective Spano raised his voice. He also contended that the officers promised him that if he confessed to the truth (his involvement), he would spend only one night in jail and then could go home. Jerrell points out that there

are many inconsistencies between his statement and those of Jerrad and other witnesses. For example, Jerrell's statement says that he did not have a black ski mask, so he used a black T-shirt as a mask. All of the employees of the McDonald's stated that the robbers wore black ski masks. Jerrell's statement indicates that another individual, "Melvin," was involved in the crime, that Melvin's car was used, and that he used some of the stolen money to buy a new cap and new shoes. Jerrad's statement, in contrast, does not mention Melvin or Melvin's car. Further, police never found the new cap or new shoes to which Jerrell referred. In addition, Jerrell contends that the eyewitnesses indicated that the light-complected robber had brown "bright" eyes. Jerrell has green eyes.

¶ 22. The trial court considered all of these facts in rendering its decision. It made credibility determinations between the testimony of the police officers and that of Jerrell. The trial court found the police officers' testimony to be credible and that no coercive tactics were used. The trial court concluded that under the totality of the circumstances, Jerrell's statement was voluntary and not a product of coercion. In part, the trial court supported its conclusion because Jerrell's statement contained details of the crime that an uninvolved person would not have known—such as the amount of money stolen and the description of the gun.

¶ 23. Having independently reviewed the totality of the circumstances and the findings of the trial court, we cannot overturn the trial court's determination, which was based, in large part, upon the credibility of the witnesses. The findings made by the trial court are not clearly erroneous and, therefore, will not be reversed by this court. Because there is no evidence of police coercion or improper conduct, we conclude that

Jerrell's confession was voluntary. Based on the forego-
ing, we conclude that the trial court did not erroneously
exercise its discretion in denying Jerrell's request to
suppress his statement.[3]

*B. Request for Parents.*

¶ 24. We address separately an issue that does not
affect the disposition of this appeal, but merits special
attention from this court. As noted, after Jerrell admit-
ted involvement, but before his statement was com-
plete, he made two or three requests to call a parent.
Detective Spano denied such a request for several
reasons: (1) Spano does not let "anyone call their
parents or relatives during the interrogation or any-
body else"; (2) he did not want to stop the flow of the

[3] We also conclude that the trial court's credibility assess-
ment of the psychologist's testimony offered as new evidence
during the postdisposition motion was not erroneous. As the
trier of fact, the trial court is the sole arbiter of the credibility
of witnesses, including expert witnesses. *State v. Kienitz*, 227
Wis. 2d 423, 440, 597 N.W.2d 712 (1999). The trial court was
free to accept or reject the psychologist's opinion. Here, the
psychologist offered an opinion that Jerrell did not knowingly
and voluntarily waive his *Miranda* rights. That opinion, how-
ever, was based in part upon Jerrell's representations to the
psychologist. The trial court compared those representations to
the testimony Jerrell offered at trial and concluded that
Jerrell's statements were inconsistent and therefore could not
be relied upon. As a result, the trial court found that the
psychologist's opinions, based upon incredible representations,
could not be deemed trustworthy. We cannot conclude that the
trial court's findings were clearly erroneous or that its credibil-
ity assessment was erroneous. Accordingly, we reject Jerrell's
claim that the trial court's assessment on this issue was
incorrect.

confession; and (3) allowing the phone call could adversely affect the investigation because Spano would lose control relative to any information exchanged via the telephone.

¶ 25. Although we have concluded that, under the facts of this particular case, the request to call parents and the denial of the request did not impact on the voluntariness of Jerrell's statement, we are gravely concerned about this issue. We are not alone. The decision to confess falsely by the youth of this country is the subject of numerous legal treatises across the nation. *See, e.g.,* Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action,* 74 Denv. U. L. Rev. 979 (1997). Concerns regarding this subject were submitted to us via the amicus curiae brief filed in this case on behalf of The Children and Family Justice Center at Northwestern University School of Law's Bluhm Legal Clinic and the Wisconsin Innocence Project at the University of Wisconsin Law School's Frank J. Remington Center.

¶ 26. In that amicus curiae brief, the authors stated that as of April 2003, 127 wrongly convicted people have been exonerated by DNA evidence. Of the first 111, 27 involved false confessions or admissions. The amicus authors argue that current psychological interrogation techniques are a major contributing factor to the false confession problem, which is magnified when the individual is a child. *See* Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogations,* 88 J. Crim. L. & Criminology 429, 472–96 (1998). Consequently, the amicus authors ask this court for two things: (1) a *per se* rule, which would exclude confessions from any child under the age of sixteen who has

been denied access to a parent or guardian; and (2) a mandatory rule requiring police to videotape all juvenile interrogations.

¶ 27. Although this court finds both requests compelling, we are without authority to order either. We are currently bound by the dictates of *Theriault*, which recognizes "that special problems may arise with respect to waiver of the [*Miranda*] privilege by or on behalf of children," 66 Wis. 2d at 39 (citation omitted) but applies the totality of the circumstances test. *Id.* at 38–44. Our supreme court rejected a request that a *per se* rule be applied when a minor confesses without the presence of a parent or legal guardian. *Id.* at 44. The court held that the absence of the parent or guardian is one factor to be considered under the totality of the circumstances test. *Id.* Consideration of this factor affords the trial court the discretion to determine the reason behind denying a juvenile's request to call his or her parents. *See id.* at 48. "If the police fail to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel, that would be strong evidence that coercive tactics were used to elicit the incriminating statements." *Id.* Accordingly, we are bound by that precedent.

¶ 28. We do note, however, that *Theriault* was decided in 1974, and the debate between the totality of the circumstances test versus a *per se* rule has been the focus of much recent attention. At least 13 states— Colorado, Connecticut, Hawaii, Indiana, Iowa, Massachusetts, Montana, New Mexico, North Carolina, Oklahoma, Texas, Vermont and West Virginia—have adopted, by case law or legislative action, some form of the *per se* rule. *See* Thomas J. Von Wald, Note, *No Questions Asked! State v. Horse: A Proposition for a*

457

*Per Se Rule When Interrogating Juveniles,* 48 S.D. L. REV. 143, 164 n. 237 (2002–03).

¶ 29. Reasons behind a *per se* rule are understandable. False confessions from juveniles are serious issues that need to be addressed. Legal scholars suggest that children simply do not understand their *Miranda* rights as well as adults. Grisso, *Juvenile's Capacities to Understand Miranda Warnings: An Empirical Analysis,* 68 CAL. L. REV. 1134, 1160 (1980). The Supreme Court stated that this is so because children lack the emotional and mental capability to make fully informed decisions. *See Bellotti v. Baird,* 443 U.S. 622, 640 (1979) (children are incapable of making decisions that "take account of both immediate and long-range consequences.") The implication is that, as a result, children are less capable of making important decisions. The Wisconsin legislature has recognized this tenet in a variety of ways: an individual must be twenty-one years old to purchase alcohol, WIS. STAT. § 125.97; an individual less than eighteen years old cannot purchase tobacco products, WIS. STAT. § 134.66; sixteen and seventeen year olds cannot get married without parental permission, WIS. STAT. § 765.02; children may not buy or lease a car without parental consent, WIS. STAT. § 218.0147; children under fourteen may not change their name without parental consent, WIS. STAT. § 786.36; and girls under eighteen may not obtain an abortion without parental consent (unless certain exceptions apply), WIS. STAT. § 48.375.

¶ 30. One author presents studies which demonstrate that a minor is more likely to give a false confession because of the inherent nature of children to want to please authority figures, coupled with the high suggestibility levels in children. *See* Jennifer J. Walters, Comment, *Illinois' Weakened Attempt to Prevent False*

*Confessions by Juveniles: The Requirement of Counsel for the Interrogations of Some Juveniles,* 33 Loy. U. Chi. L.J. 487, 504–05 (2002). This article states that in some cases, "minors are incapable of fully realizing the consequences of their decisions," and therefore confess "because they believe it is the only way to end a psychologically coercive interrogation." *Id.* at 505. It is argued then, that taking this together with the additional knowledge that police can, without breaking any laws, lie about evidence, engage in trickery, and verbally harass suspects in order to obtain a confession, juveniles may confess to crimes they did not commit. According to one study, over a two-year period, almost a dozen juveniles in the United States who confessed to committing murder were subsequently proven innocent. *Id.* at 489. This problem is particularly troubling because once a child confesses, such evidence carries great weight with the fact-finder.

¶ 31. Having set forth the problem, the issue becomes: What is the solution? Courts and legislatures across the country are attempting to tackle the problem. The Vermont Supreme Court has set forth three criteria that must be satisfied before a juvenile's waiver would be found to be voluntary: (1) the juvenile "must be given the opportunity to consult with an adult; (2) that adult must be one who is not only generally interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) the independent interested adult must be informed and be aware of the rights guaranteed to the juvenile." Von Wald, 48 S.D. L. Rev. at 165 (citation omitted).

¶ 32. Alaska and Minnesota have recording requirements for all custodial interrogations. *See Stephan*

*v. State,* 711 P.2d 1156, 1159 (Alaska 1985); *State v. Scales,* 518 N.W.2d 587, 592 (Minn. 1994). Some suggest that the "totality of the circumstances" analysis works best when it is based on a videotape of the interrogation. It is this court's opinion that it is time for Wisconsin to tackle the false confession issue. We need to take appropriate action so that the youth of our state are protected from confessing to crimes they did not commit. We need to find safeguards that will balance necessary police interrogation techniques to ferret out the guilty against the need to offer adequate constitutional protections to the innocent.

*By the Court.*—Orders affirmed.

¶ 33. SCHUDSON, J. *(concurring).* Although I agree with the Majority's conclusion, I believe its opinion goes too far.

¶ 34. Was Jerrell's statement coerced? Because, as the Majority correctly concludes, (1) the trial court's factual findings are not clearly erroneous, and (2) *Theriault v. State,* 66 Wis. 2d 33, 223 N.W.2d 850 (1974), precludes the *per se* rule the Remington Center seeks, the answer is no. And here, under the totality of the circumstances, the answer is all the more clear because Jerrell's request to call his parents came *after* he confessed.

¶ 35. That should conclude the analysis of the central issue in this appeal. The Majority, however, while acknowledging that its additional discussion "does not affect the disposition of this appeal," Majority at ¶ 24, goes on to comment at length on various topics relating to the possible propriety of a *per se* rule, Majority at ¶¶ 25–32. In doing so, the Majority approvingly cites certain case law and commentaries even though, in this case, they were not subjected to any debate or adversarial testing. This, I think, is unwise.

¶ 36. For sound reasons, we usually refrain from addressing issues that need not be resolved. *See State v. Mikkelson*, 2002 WI App 152, ¶ 17 n.2, 256 Wis. 2d 132, 647 N.W.2d 421 (we decide cases on the narrowest grounds). And for equally sound reasons, we usually resist the temptation to offer advisory opinions, particularly when the subject is a complicated one that has not been thoroughly explored through the adversarial process. *See State v. Robertson*, 2003 WI App 84, ¶ 32, 263 Wis. 2d 349, 661 N.W.2d 105 ("Courts act only to determine actual controversies—not to announce principles of law or to render purely advisory opinions."). We should not deviate here.

¶ 37. Therefore, although I also am intrigued by the Remington Center's suggestions and, in particular, by its arguments favoring the videotaping of all police interrogations, I believe these issues are best left unaddressed in this appeal. Accordingly, while agreeing with much of the Majority's opinion, I do not join in it entirely and, therefore, respectfully concur.