STATE of Wisconsin, Plaintiff-Appellant,†

v.

Patrick J. LYNCH, Defendant-Respondent.

Court of Appeals

*No. 2011AP2680–CR. Submitted on briefs September 16, 2014.
—Decided November 6, 2014.*

2015 WI App 2

(Also reported in 859 N.W.2d 125.)

† Petition for Review filed.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Rebecca Rapp St. John*, assistant attorney general, *Marguerite M. Moeller*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Jack M. Priester* of Madison.

Before Blanchard, P.J., Lundsten and Higginbotham, JJ.

¶ 1. LUNDSTEN, J. The State alleges that A.M., now 32 years old, was sexually assaulted by Patrick Lynch when she was a young girl. After Lynch was charged, he brought a pretrial motion for an in camera review of A.M.'s mental health treatment records. The circuit court concluded that Lynch made the required showing for an in camera review. The court further concluded that, because A.M. refused to release her treatment records for an in camera review, *State v. Shiffra*, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), required the court to exclude A.M.'s testimony at Lynch's trial. The State appeals the court's non-final order excluding A.M.'s testimony.[1] We agree with the circuit court that Lynch made the required showing. We

---

[1] WISCONSIN STAT. § 974.05(1)(d)2. provides that the State may appeal an "[o]rder or judgment the substantive effect of which results in . . . [s]uppressing evidence." All references to

486

also agree with the circuit court that, under *Shiffra*, the only available remedy when a victim refuses to disclose records for an in camera review is the exclusion of the victim's testimony at trial. Accordingly, we affirm the circuit court, and remand for further proceedings.

### *Background*

¶ 2. In the early 1990s, when A.M. was a young child, she was repeatedly sexually assaulted by her father, who in 1993 was convicted based on A.M.'s allegations and other proof. Around the same time, or at some later date, A.M. alleged that Lynch repeatedly sexually assaulted her during the same time period that her father was sexually assaulting her. As the record stands now, in this pretrial posture there are factual disputes regarding, among other things, when A.M. first made allegations against Lynch and whether A.M. exhibits ongoing post-traumatic stress disorder (PTSD)-related symptoms that have impaired, and still do impair, her ability to accurately recall or describe pertinent events.

¶ 3. At Lynch's preliminary hearing, when A.M. was 29 years old, A.M. testified as follows. A.M. was about seven years old when her father began sexually abusing her at her father's home in 1990. About six months to a year after the abuse by her father started, Lynch also began sexually abusing A.M. at her father's home. A.M.'s father was home during the incidents involving Lynch, and A.M's father continued abusing A.M. during the same time period. Lynch had sexual

the Wisconsin Statutes are to the 2011–12 version, the current version. Although the pertinent events in this case go back many years, we cite the current version of the statutes for the sake of simplicity. There have been no intervening changes in the statutes that affect our decision.

contact with A.M. on six or seven separate occasions. The abuse by Lynch included penis-to-vagina intercourse, and there was at least one instance in which Lynch forced A.M. to perform oral sex on him. A.M. first reported the sexual abuse by her father in 1992.[2]

¶ 4. During the preliminary examination, A.M. testified regarding when she first reported Lynch's behavior. A.M. asserted that she told the prosecutor in her father's case, one or more detectives, and a counselor that Lynch was also sexually assaulting her. According to A.M., the prosecutor and the police told her that they would first deal with A.M.'s father and then "come back to [Lynch] later." As we will see, as part of his offer of proof in support of his motion for an in camera review of A.M.'s treatment records, Lynch submitted evidence contradicting this testimony.

¶ 5. Lynch was charged in 2010, approximately 19 years after the alleged abuse occurred. Lynch filed his motion seeking an in camera review of A.M.'s treatment records dating back to 1993, and in particular her mental health treatment records relating to two psychological treatment providers. Lynch argued that there was a reasonable likelihood that A.M.'s treatment records contained probative, noncumulative evidence helpful to Lynch's defense. The circuit court agreed.

¶ 6. Following the circuit court's ruling, A.M. refused to authorize release of her treatment records for an in camera review. Faced with this refusal, the circuit court concluded that *Shiffra* required the court to exclude A.M.'s testimony at Lynch's trial. The court

---

[2] A.M. does not explicitly refer to 1992 at this point in her preliminary hearing testimony but, in context, and considering A.M.'s birth date and her references to her age at pertinent times, this appears to be the year she meant.

entered a written order to this effect, and that is the order the State has appealed.[3]

### *Discussion*

¶ 7. The State raises two issues: whether Lynch made the required showing for an in camera review of A.M.'s treatment records, and, if Lynch did make such a showing, whether the only available remedy under *Shiffra* given A.M.'s refusal to disclose records is exclusion of her testimony at Lynch's trial. For the reasons we explain below, we agree with the circuit court on both issues.

---

[3] The circuit court's order was issued in November 2011. Before the parties' briefing in this appeal was complete, the State moved in May 2012 for an order placing the appeal on hold pending supreme court review of our decision in *State v. Johnson*, No. 2011AP2864–CRAC, unpublished slip op. ¶¶ 16–18 (WI App Apr. 18, 2012) (*Johnson I*). Lynch did not oppose the State's motion, and we granted it. The issues presented for supreme court review by *Johnson I* included (1) whether *State v. Shiffra*, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), should be overruled and (2) whether a circuit court may compel production of a victim's privately held, privileged mental health treatment records for an in camera review when the victim refuses to release the records. *See State v. Johnson*, 2013 WI 59, ¶¶ 2, 4, 348 Wis. 2d 450, 832 N.W.2d 609 (*Johnson II*). On July 3, 2013, the supreme court issued a per curiam decision in *Johnson II* without a majority to overrule *Shiffra* and without a majority opinion on the second issue. *See Johnson II*, 348 Wis. 2d 450, ¶¶ 1–10. On March 26, 2014, the supreme court issued a decision reconsidering *Johnson II* in *State v. Johnson*, 2014 WI 16, 353 Wis. 2d 119, 846 N.W.2d 1 (*Johnson III*), which also contained no majority to overrule *Shiffra* and no majority opinion on the second issue. *See Johnson III*, 353 Wis. 2d 119, ¶¶ 7–13; *see also id.*, ¶ 27 (Bradley, J., concurring in part and dissenting in part). On June 13, 2014, the State filed its reply brief in Lynch's case, completing the briefing in this appeal.

## A. Sufficient Showing For An In Camera Review

¶ 8. The supreme court's decision in *State v. Green*, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, summarizes the standards that apply when a criminal defendant seeks an in camera review of a victim's mental health treatment records. In short, the defendant has the burden of making a fact-specific showing of a "reasonable likelihood" that the records will contain probative, noncumulative evidence necessary to the determination of the defendant's guilt or innocence:

> The mere contention that the victim has been involved in counseling related to prior sexual assaults or the current sexual assault is insufficient. Further, a defendant must undertake a reasonable investigation into the victim's background and counseling through other means first before the records will be made available. From this investigation, the defendant, when seeking an in camera review, must then make a sufficient evidentiary showing that is not based on mere speculation or conjecture as to what information is in the records. In addition, the evidence sought from the records must not be merely cumulative to evidence already available to the defendant. A defendant must show more than a mere possibility that the records will contain evidence that may be helpful or useful to the defense.
>
> ... [T]he preliminary showing for an in camera review requires a defendant to set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant. We conclude that the information will be "necessary to a determination of guilt or innocence" if it "tends to create a reasonable doubt that

might not otherwise exist." This test essentially requires the court to look at the existing evidence in light of the request and determine, as the *Shiffra* court did, whether the records will likely contain evidence that is independently probative to the defense.

*Id.*, ¶¶ 33–34 (citations and quoted source omitted).

**[6, 7]**

¶ 9. Our standard of review is mixed. "Factual findings made by the court in its determination are reviewed under the clearly erroneous standard." *Id.*, ¶ 20. However, the ultimate question of "[w]hether the defendant submitted a preliminary evidentiary showing sufficient for an in camera review implicates a defendant's constitutional right to a fair trial and raises a question of law that we review de novo." *Id.*

██

¶ 10. Here, the State does not argue that the circuit court erred when finding facts. Rather, we understand the State to be arguing that we should review de novo whether the factual assertions in Lynch's offer of proof, along with any other, undisputed facts, are sufficient as a matter of law to justify an in camera review under *Green*. Accordingly, we address the matter de novo.

¶ 11. As we describe in more detail below, Lynch submitted a detailed offer of proof in support of his motion for an in camera review of A.M.'s treatment records. Lynch offered factual assertions and documents to support his theory that A.M.'s treatment records contain probative, noncumulative evidence bearing on the reliability of A.M.'s allegations against Lynch for three reasons:

(1) A.M. exhibits ongoing symptoms associated with PTSD that affect her memory;

491

(2) A.M. did not report Lynch to any treatment providers as a child; and

(3) A.M. has "Sociopathic Personality Disorder," a symptom of which is "an ability to lie on a pathological level."

¶ 12. Lynch's offer of proof was based on (1) materials available from A.M.'s father's 1993 prosecution, (2) information generated during the government's criminal investigation of Lynch and obtained through discovery, (3) information generated during defense counsel's independent investigation, and (4) a defense expert's psychological report.[4] According to Lynch's offer:

- In 1992, around the time that A.M.'s father was charged, A.M. was admitted to a hospital because of an apparent suicide attempt.

- A.M.'s family physician at that time made a referral to Dr. Sionag Black for stress reduction therapy.

- Dr. Black treated A.M. for psychological symptoms stemming from the trauma of sexual abuse and the trauma of reporting the sexual abuse committed by her father.

---

[4] We primarily rely on Lynch's amended offer of proof, but also glean some allegations from A.M.'s preliminary hearing testimony. We perceive no dispute regarding which materials we should consider. Also, in Lynch's amended offer of proof, he requested "mental health records compiled by Doctors [Sionag] Black and [Rachel] Heilizer between the years 1993 and 2011." In his motion for an in camera review, however, Lynch stated his request more broadly to include records of Black, Heilizer, "or others" for that same time period. Also, the circuit court ordered that A.M. "identify" any other treatment providers. As far as we can tell from the briefing, whether Lynch's request applies to providers other than Black and Heilizer does not affect any argument made by either party on appeal, so we do not weigh in on this topic.

- During A.M.'s father's 1993 trial, A.M.'s family physician testified that A.M. had been treated by "child psych," that A.M. had faked symptoms, and that most of A.M.'s symptoms were stress-related.

- A.M. continued in treatment with Dr. Black after A.M.'s father's trial.

- Dr. Black prepared a letter in 1993 that was addressed to the circuit court for A.M.'s father's sentencing. The letter stated that Dr. Black "carefully assess[ed] the possibility of any other person who might [have] been involved" and that A.M. "identified no one." The letter also stated that A.M. was "very clear" in repeatedly identifying her father as the perpetrator.

- Dr. Black's 1993 letter further stated that A.M. became suicidal after reporting the sexual assaults committed by her father, and that A.M. exhibited symptoms characteristic of PTSD. Dr. Black said that she had never before "witnessed a child this afraid and this traumatized by the act of reporting abuse."

- At some point after treatment with Dr. Black, A.M. began treatment with another psychologist, Dr. Rachel Heilizer.

- A.M. continued in counseling for more than 15 years, with the majority of treatment through at least 2009 being provided by Dr. Heilizer.

- In a March 2009 interview with investigators, A.M. reported that Lynch performed repeated acts of sexual intercourse with her during 1990 and 1991.

- In a subsequent March 2009 interview with investigators, A.M. said that, during her high school years, she spoke with Dr. Heilizer regarding A.M.'s allegations against Lynch.

- In a 2009 interview with investigators, A.M.'s ex-husband said that he no longer trusted A.M., in part because of lies A.M. has told.

- In a 2010 interview, A.M.'s half-sister told defense counsel that she ended her friendship with A.M., in part because of experiences showing that A.M. is not trustworthy and is not believable.

- When the prosecutor from A.M.'s father's case was interviewed by investigators in Lynch's case, the prosecutor denied that A.M. told the prosecutor about Lynch, contrary to A.M.'s preliminary hearing testimony.

- Other witnesses stated that A.M. told them—in one instance as early as 1999 or 2000—that Lynch had sexually assaulted her, although the details of A.M.'s allegations varied.

- The defense psychological expert, Dr. Bev Wolfgram, opined in a January 2011 report that there is a reasonable likelihood that A.M. continues to suffer from PTSD.

- Dr. Wolfgram further opined that there is a reasonable likelihood that A.M. has "Sociopathic Personality Disorder which is also classified as Antisocial Personality Disorder," a disorder that, according to Wolfgram, is associated with "manipulati[on] and conning," "pathological lying," and "unreliability."

██

¶ 13. Based on this offer and the other, undisputed facts before it, the circuit court concluded that Lynch showed a reasonable likelihood that A.M.'s treatment records would contain probative, noncumulative evidence necessary to the determination of Lynch's guilt or innocence. *See Green*, 253 Wis. 2d 356, ¶¶ 33–34. More specifically, the circuit court agreed with Lynch's first and second asserted reasons for an in

camera review, namely, that there was a reasonable likelihood that A.M.'s records contain information highly damaging to A.M.'s credibility because there is a reasonable likelihood that the records will reveal

(1) that A.M. exhibits ongoing symptoms associated with PTSD that affect her ability to recall and describe pertinent events, and

(2) that A.M. failed to report Lynch to treatment providers, at least as a child.

The circuit court declined to rely on Lynch's third reason.

¶ 14. As explained further below, we agree with the circuit court's approach. We first discuss the likelihood that A.M. exhibits ongoing PTSD-related symptoms that bear on the reliability of her allegations against Lynch, and we observe at the outset that this reason is the primary justification for an in camera review of A.M.'s treatment records. We see the second reason, delayed reporting, as closely related and bolstering the first reason. We need not decide whether either reason, standing alone, warrants an in camera review of A.M.'s treatment records. Below, we discuss each reason and then discuss separately the State's argument that any evidence gleaned from A.M.'s treatment records would be cumulative.

### 1. Ongoing PTSD-Related Symptoms

¶ 15. A number of assertions in Lynch's offer of proof, when considered together, support the conclusion that there is a reasonable likelihood that A.M. suffers from ongoing PTSD-related symptoms that have in the past impaired, and still do impair, her ability to recall and describe the alleged events involving Lynch. Those assertions include:

- A.M.'s attempted suicide, occurring when she was only 10 years old after reporting that her father had sexually abused her;

- Dr. Black's opinion that A.M. exhibits PTSD symptoms and that A.M. was more "afraid" and "traumatized" than any other child reporting abuse that Dr. Black had seen;

- A.M.'s ongoing counseling, stemming from childhood sexual abuse and continuing for more than 15 years;

- Apparent conflicts between A.M.'s claims that she reported Lynch at the same time she reported her father and statements by Dr. Black in her 1993 letter and the prosecutor in A.M.'s father's case that A.M. did not identify Lynch as a perpetrator;

- Statements given by A.M.'s ex-husband and half-sister to criminal investigators suggesting that they view A.M. as untruthful or untrustworthy; and

- The defense expert's 2011 opinion that there is a reasonable likelihood that A.M. continues to suffer from PTSD.

¶ 16. In addition, Lynch asserted in his offer of proof that it is recognized that those individuals who suffer from PTSD and report childhood sexual abuse are more likely than others to have false memories. And, at the hearing on Lynch's motion for an in camera review, Lynch supplemented his written offer of proof by reading expert testimony from A.M.'s father's trial. This included opinion evidence suggesting that individuals with severe PTSD are much more likely than others to have false memories or difficulty differentiating between "fact and fantasy." Additionally, Lynch points out in his appellate briefing, and the State does

not dispute, that symptoms commonly associated with PTSD include "acting or feeling as if the traumatic event were recurring" and "a sense of reliving the experience, *illusions, hallucinations, and dissociative flashback episodes.*" Finally, the circuit court determined that medical journals and case law show that PTSD may impair a witness's ability to accurately recall and describe pertinent events.

¶ 17. As far as we can tell, the State does not dispute that any of the described symptoms are commonly associated with PTSD, or that such symptoms can seriously impair a person's ability to accurately recall or describe pertinent events. Rather, the State argues that the PTSD-related information about A.M. available here is too limited because Lynch made no affirmative, fact-specific showing that A.M. *currently* suffers from PTSD or that A.M. actually exhibits any particular PTSD symptom that would impair her ability to recall or describe pertinent events. The State asserts that there is not a reasonable likelihood that "[A.M.] still suffers from this condition" and "[m]ore importantly," "no reason to believe that even if A.M. continues to suffer from PTSD, she is unable to accurately relate the truth as a result." The State asserts that "[a] person suffering from a particular mental illness does not *necessarily* experience each and every symptom associated with that illness" (emphasis added).

¶ 18. We agree that a person with a given psychological disorder does not necessarily experience all of the commonly associated symptoms of that disorder. We conclude, however, that the State's focus on A.M.'s "current" state is too narrow. We also conclude that Lynch has made a fact-specific showing that A.M.'s treatment records are reasonably likely to show that A.M. has exhibited particular ongoing symptoms asso-

497

ciated with PTSD that have impaired, and do still impair, her ability to accurately recall or describe pertinent events.

¶ 19. As to the State's argument being too narrowly focused on A.M.'s current status, we observe that, even if A.M. does not currently suffer from PTSD symptoms, that would not mean that a past history of PTSD is not evidence reasonably likely to help Lynch's defense. When we consider A.M.'s claims about when she reported Lynch, along with Lynch's offer of proof and other, undisputed facts, there are a number of potential times when A.M. has alleged or reaffirmed allegations of sexual abuse by Lynch.[5] The pertinent times include:

- In 1992 or 1993 (according to A.M. in her preliminary hearing testimony);

- Several years later, when A.M. was in high school (according to Lynch's offer of proof describing a 2009 statement given by A.M.);

- In 1999 or 2000 (according to Lynch's offer of proof describing a statement by A.M. to a potential witness interviewed in 2009 by criminal investigators);

- In 2003 (according to Lynch's offer of proof describing a statement by an individual who had been in counseling with A.M. and was later interviewed by criminal investigators);

- In 2004 or 2005 (according to Lynch's offer of proof describing a statement by another potential witness interviewed in 2008 by criminal investigators);

- In 2007 (according to Lynch's offer of proof describing a statement by still another potential witness interviewed in 2009 by criminal investigators);

---

[5] According to Lynch's offer, the details of A.M.'s allegations have varied greatly over time.

- In 2009 (according to Lynch's offer of proof describing 2009 statements A.M. gave when interviewed by criminal investigators); and

- In 2011 (according to A.M.'s preliminary hearing testimony).

¶ 20. As to the rest of the State's argument, we think it misses the mark because it places a higher burden on Lynch than *Green* requires.

■

¶ 21. The State argues that "A.M. has not been shown to suffer from" any mental disability that affects her ability to distinguish between reality and something imagined. This statement is true as far as it goes, but Lynch was not required to make a definite showing for purposes of an in camera review. Rather, the *Green* standard is concerned with *reasonable likelihoods* about what treatment records will reveal. As the court in *Green* explained:

> [The] standard is not intended . . . to be unduly high for the defendant before an in camera review is ordered by the circuit court. The defendant, of course, will most often be unable to determine the specific information in the records. Therefore, in cases where it is a close call, the circuit court should generally provide an in camera review.

*Green*, 253 Wis. 2d 356, ¶ 35; *see also State v. Robertson*, 2003 WI App 84, ¶ 21, 263 Wis. 2d 349, 661 N.W.2d 105 ("Given the confidential nature of mental health records, it makes it very difficult in most cases for the defendant to predict what evidence will be found during a review of the records and thus how it may be material to the case.").

¶ 22. The State argues that *State v. Behnke*, 203 Wis. 2d 43, 553 N.W.2d 265 (Ct. App. 1996), supports its view that Lynch's showing in regard to the probative

value of PTSD-related symptoms is insufficient. We disagree. We said in *Behnke* that a victim's history of cutting or bruising her own arm was not by itself sufficient to justify an in camera review of her treatment records to discover whether she may also have a tendency to injure herself in more severe ways, a tendency the defense thought might explain a black eye and chest bruising that the victim received in the course of an alleged sexual assault. *See id.* at 51, 54–55. Here, as we understand it, the State contends by analogy that *Behnke* supports the proposition that the limited information available about A.M's history of PTSD does not suggest that A.M.'s treatment records contain information showing that A.M. exhibits particular PTSD symptoms that affect A.M.'s credibility. We see this as a weak analogy at best, and are not persuaded by it. Given the limited facts in *Behnke*, it was plainly speculative to think that the victim's treatment records would contain information necessary to the defense. We demonstrate above in our discussion of ongoing PTSD-related symptoms, and will demonstrate below in our discussion of the delayed reporting issues in this case, why the same cannot be said here.

¶ 23. We agree with Lynch that a comparison to *Robertson* is more apt. In *Robertson*, the defendant made a fact-specific showing that a sexual assault victim was treated for a mental health condition (depression with psychotic features) that could affect her credibility and that might provide an alternative explanation for the victim's behavior that was otherwise consistent with an assault. *See Robertson*, 263 Wis. 2d 349, ¶¶ 27–28. We distinguished *Behnke*, and concluded that the defense had made the required showing for an in camera review of the victim's treatment records. *Robertson*, 263 Wis. 2d 349, ¶¶ 30–31.

¶ 24. Here, at least when viewed in combination with the delayed reporting information we consider next, we conclude that Lynch made a fact-specific showing that it is reasonably likely that A.M.'s treatment records will contain evidence that has a direct bearing on the critical question of her credibility.

## 2. Delayed Reporting

¶ 25. We turn to Lynch's second reason for why there should be an in camera review of A.M.'s treatment records—the likelihood that those records will contain evidence of delayed reporting to treatment providers. The parties dispute two aspects of delayed reporting.

¶ 26. First, the parties dispute whether the failure of a treatment provider, who is a mandatory reporter of child abuse and who has professional contact with a child, to report child abuse by a particular perpetrator makes it reasonably likely that the records of the provider will reflect that the child did not report abuse by that particular perpetrator to the provider. Applied here, the parties dispute whether the absence of reporting to authorities—of the possibility of sexual abuse committed by Lynch—by the mandatory-reporter providers who treated A.M. when she was a child makes it reasonably likely that those providers' treatment records will support a finding that, during contacts with those providers when A.M. was a child, she did not report that Lynch assaulted her.

¶ 27. Second, the parties dispute whether any delayed reporting evidence that might be found in A.M.'s treatment records is probative. That is, assuming A.M.'s treatment records support a finding that A.M., when she was a child, did not report Lynch to her treatment providers, the parties dispute whether such

501

evidence is reasonably likely to be probative with respect to the truthfulness of A.M.'s allegations against Lynch.

¶ 28. We address each dispute separately·below. Because we resolve both disputes in Lynch's favor, it follows that this part of Lynch's offer supports the circuit court's conclusion that Lynch has made a sufficient showing under *Green* for an in camera review.

### a. Likelihood That The Records Contain Evidence Of Delayed Reporting To Treatment Providers

¶ 29. As we have explained, the parties dispute whether the absence of reporting to authorities—of the possibility of sexual abuse committed by Lynch—by the mandatory-reporter providers who treated A.M. when she was a child makes it reasonably likely that those providers' treatment records will support a finding that, during contacts with those providers when A.M. was a child, she did not report that Lynch assaulted her. This dispute boils down to a more generally applicable question: Does the failure of a mandatory reporter, who has professional contact with a child, to report child abuse by a particular perpetrator make it reasonably likely that the provider's records will reflect that the child did not report abuse by that particular perpetrator? We conclude, as did the circuit court, that this question is, effectively, answered in *State v. Speese*, 191 Wis. 2d 205, 528 N.W.2d 63 (Ct. App. 1995) (*Speese I*), a decision the supreme court reversed on other grounds in *State v. Speese*, 199 Wis. 2d 597, 545 N.W.2d 510 (1996) (*Speese II*).

¶ 30. We reasoned in *Speese I* that, when a child's treatment provider is required by law to report sexual abuse of the child, and that provider makes no report,

this is sufficient reason to conclude for purposes of in camera review that the child did not disclose abuse to the provider. *See Speese I*, 191 Wis. 2d at 223–24. As far as we can tell, there is no dispute here that A.M.'s treatment providers did not report Lynch to authorities. Thus, under the reasoning of *Speese I*, there is a reasonable likelihood that A.M. did not tell her treatment providers of sexual abuse by Lynch, at least not during the time that A.M. was a child and her treatment providers were, consequently, subject to mandatory reporting requirements.

¶ 31. Although we agree with the State that it is reasonable to assume that mandatory reporters do not always report when they should, it is simultaneously reasonable to assume—for purposes of whether records contain evidence of non-reporting—that mandatory reporters typically do report as required. Thus, like the circuit court (and consistent with this court's approach in *Speese I*), we conclude that the absence of reporting by A.M.'s treatment providers while A.M. was a child makes it reasonably likely that A.M.'s treatment records will support the finding that A.M. did not report Lynch to these providers.

¶ 32. The dispute arises here because the State argues that the supreme court's decision in *Speese II* overruled the pertinent mandatory-reporter reasoning in *Speese I*. The State points to the portion of *Speese II* in which the supreme court determined that any error in denying an in camera review was harmless because "evidence in the victim's medical and psychiatric records of her silence regarding the defendant's sexual abuse would have been redundant." *See Speese II*, 199 Wis. 2d at 605. But this quotation simply shows that the *Speese II* court chose not to address our mandatory reporter analysis, not that the court disagreed with that

analysis or chose to reverse on that topic. Rather, consistent with our reasoning in *Speese I*, the *Speese II* court assumed without deciding that the circuit court should have conducted an in camera review of the records before trial, and the *Speese II* court proceeded to address whether the failure to conduct the review was harmless. *See Speese II*, 199 Wis. 2d at 598–600, 604–06, 614. The court concluded that any error was harmless because the delayed reporting information alleged to be in the victim's treatment records would have been cumulative to the other evidence adduced at trial. *See id.* at 600, 604–06.

¶ 33. Apart from its *Speese II* argument, the State contends that delayed reporting by victims should not be a reason for an in camera review of their treatment records. Whatever merit this argument has, it does not implicate the narrow conclusion we reach here—that the absence of reporting by A.M.'s treatment providers while A.M. was a child makes it reasonably likely that the providers' treatment records will support a finding that A.M. did not report Lynch to these providers. Rather, the State's contention that delayed reporting by victims, *when it occurs,* should not be a reason for an in camera review of the victims' treatment records goes to whether such evidence is probative, a topic we address next.

### b. Likelihood That Evidence Of Delayed Reporting To Treatment Providers In This Case Is Probative

¶ 34. The State argues that delayed reporting by a sexual assault victim should not be a reason for an in camera review of the victim's treatment records. The State asserts that sexual assault victims, and particularly certain child sexual assault victims, commonly delay reporting. That assertion may be true in the

general run of cases, but delayed reporting, by itself, is not the issue. Rather, the question is whether delayed reporting to treatment providers is probative in the case at hand. Here, as we have explained, the question is whether, under all of the circumstances Lynch presents, there is a reasonable likelihood that information about delayed reporting in A.M.'s treatment records will be independently probative on the question of A.M.'s credibility. And, as we now demonstrate, there is nothing typical or common about the alleged delayed reporting here.

¶ 35. The defense theory here is that although A.M., as a young child, reported that her father sexually abused her, she delayed reporting Lynch to her treatment providers, and others, for many years even though the abuse by her father and her allegations against Lynch overlap in terms of place and time. Thus, unlike a more typical sexual assault case involving some amount of delayed reporting of a single perpetrator, to succeed at trial here the State will likely need to provide a reasonable explanation for why A.M. would report one perpetrator but not another who assaulted her during the same time period in the same location. Lynch's briefing persuasively underscores the unusual circumstances of A.M.'s alleged delayed reporting:

> A.M. did *not* delay disclosing sexual assaults; she in fact disclosed the sexual assaults she claimed were perpetrated by A.M.'s father. So we do not have in this case a simple delay in reporting. Rather, there *was* contemporaneous reporting by A.M. about her father. And, although the alleged assaultive conduct by Lynch was supposedly occurring at the same time as the assaults by A.M.'s father, there was a lengthy period where no allegations were made by A.M. against Mr. Lynch . . . .

505

That sequence of events is, in fact, contrary to the State's assertion that there is nothing unique about the non-reporting.

¶ 36. In summary as to delayed reporting, we conclude that the absence of reporting by mandatory reporters is sufficient to show a reasonable likelihood that there is evidence of delayed reporting in A.M.'s treatment records, and, under all of the circumstances here, a reasonable likelihood that evidence of delayed reporting in the treatment records will be probative. In further summary, we conclude that Lynch's showing as to delayed reporting, in combination with Lynch's PTSD showing, is sufficient under *Green* to warrant an in camera review of A.M.'s treatment records.

### 3. The State's Argument That Any Information In The Records Is Cumulative

¶ 37. The State also argues that any relevant information in A.M.'s treatment records is cumulative. More specifically, the State argues that Lynch does not need A.M.'s records because he already has access to significant evidence of A.M.'s "reporting history." The State asserts that such evidence includes:

- The denial by the prosecutor in A.M.'s father's case that A.M. told the prosecutor about Lynch;

- Assertions in Lynch's offer of proof suggesting that A.M. did not report Lynch to criminal investigators until 2009;

- A.M.'s treatment records that were disclosed as part of A.M.'s father's trial, apparently in 1992 or no later than 1993; and

- Dr. Black's statement in Black's 1993 letter that A.M. identified no perpetrator other than A.M.'s father.

506

The State argues that, given all of this evidence, any delayed reporting information in the treatment records now in dispute is cumulative. We disagree, and conclude for two reasons that Lynch has shown a reasonable likelihood that the treatment records now at issue contain probative information that is not cumulative.

¶ 38. First, even though it appears that Lynch already has access to evidence showing that A.M. delayed for years in reporting Lynch, there is a reasonable likelihood that A.M.'s treatment records will contain particularly powerful evidence on this subject: evidence that A.M. did not report Lynch to mental health providers, in a confidential setting, who were counseling her for ongoing psychological trauma relating to childhood sexual abuse. As to the State's assertion that this evidence is cumulative to Dr. Black's letter stating that, as of the date of that letter in 1993, A.M. reported no perpetrators other than her father, we are not persuaded. The letter confirms only that A.M. did not make allegations about Lynch to Dr. Black as of 1993, when A.M. would have been eleven years old. Treatment records after that time—i.e., the records Lynch now seeks to have disclosed for an in camera review—may show that A.M. did not report Lynch to Dr. Black or any other treatment provider for at least another seven years.

¶ 39. Second, the State's "cumulative" arguments do not undercut our primary reasoning relating to the reasonable likelihood that A.M.'s treatment records will contain evidence that A.M. exhibits ongoing PTSD-related symptoms that call the reliability of her allegations against Lynch into question. The State does not develop an argument explaining why information on that topic would be cumulative.

507

¶ 40. Accordingly, we agree with the circuit court that Lynch made the showing required to have the circuit court conduct an in camera review of A.M.'s treatment records. We turn now to the parties' dispute over the appropriate remedy in light of A.M.'s refusal to allow an in camera review of her records.

### B. Exclusion Of A.M.'s Testimony At Lynch's Trial

¶ 41. The State argues that, even if Lynch made a sufficient showing for an in camera review, the circuit court erred in concluding that the only available remedy for A.M.'s refusal to authorize release of her records for an in camera review is the exclusion of A.M.'s testimony at Lynch's trial. According to the State, an alternative remedy, pursuant to WIS. STAT. § 146.82(2), is to order release of the records, initially to the circuit court for an in camera review and, if necessary after that review, to the parties, without A.M.'s authorization.[6]

¶ 42. If we were writing on a clean slate, we could address the merits of the State's remedy argument. There may be merit to the idea that, in some circumstances, other alternatives should be available to circuit courts. However, we agree with the circuit court that we are bound by plain language in *Shiffra* that forecloses alternative remedies.

¶ 43. *Shiffra* addressed whether a circuit court has a choice other than to exclude a victim's testimony

---

[6] WISCONSIN STAT. § 146.82(2) provides, in pertinent part:

> (2) ACCESS WITHOUT INFORMED CONSENT. (a) Notwithstanding sub. (1) [pertaining to confidentiality of patient health care records], patient health care records shall be released upon request without informed consent in the following circumstances:
>
> . . . .
>
> 4. Under a lawful order of a court of record.

at trial when a defendant has made the required showing for an in camera review of treatment records and the victim, nonetheless, refuses to authorize the release of those records. We wrote:

> In this situation, *no other sanction would be appropriate*. The court did not have the authority to hold [the victim] in contempt because she is not obligated to disclose her psychiatric records. An adjournment in this case would be of no benefit because the sought-after evidence would still be unavailable. Under the circumstances, *the only method* of protecting Shiffra's right to a fair trial *was to suppress [the victim]'s testimony* if she refused to disclose her records.

*Shiffra*, 175 Wis. 2d at 612 (emphasis added). *Shiffra*'s use of "In this situation" and "Under the circumstances," read in context, is plainly a reference to the "situation" or "circumstance" in which a defendant makes the required showing and the victim refuses to authorize release of the records for an in camera review. There is nothing in *Shiffra* suggesting that the use of this language was meant to restrict the holding to some unspecified subset of situations or circumstances in which a defendant makes the required showing and the victim refuses to release records.

¶ 44. Our reading of this part of *Shiffra* is the same reading we gave it in *Speese I*:

> Because Speese made the required preliminary showing as to [the victim]'s . . . psychiatric records, the trial court should have ordered that unless [the victim] consented to an *in camera* inspection of those records, she would not be permitted to testify at the trial. *Shiffra*, 175 Wis. 2d at 612, 499 N.W.2d at 724–25 . . . .
>
> . . . .
>
> If [the victim] does not waive her privilege . . . as to the hospital records, the trial court shall not allow her

509

to testify at a new trial. As in *Shiffra*, 175 Wis. 2d at 612, 499 N.W.2d at 724, no other disposition would be appropriate under such circumstances.

*Speese I*, 191 Wis. 2d at 224–25. And, as we have already indicated, the supreme court has not modified or overruled the pertinent part of *Shiffra*. *See* n.3, *supra*. It follows that we are bound by *Shiffra*. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) (only the supreme court may overrule, modify, or withdraw language from a published court of appeals opinion).

¶ 45. Accordingly, we uphold the circuit court's determination that, under *Shiffra*, A.M.'s testimony must be excluded from Lynch's trial if A.M. continues to refuse to allow the circuit court to conduct an in camera review of her treatment records.

### *Conclusion*

¶ 46. In sum, for the reasons explained, we affirm the circuit court's order excluding any testimony by A.M. at Lynch's trial. If, on remand, A.M. modifies her position with respect to disclosure of her records, the topic should be revisited.

*By the Court.*—Order affirmed and cause remanded for further proceedings.